UNITED STATES of America

v.

**Biagio PINTO a/k/a Bob Pinto.**

**Crim. A. No. 79–133.**

United States District Court,
E. D. Pennsylvania.

Feb. 28, 1980.

Peter F. Vaira, U. S. Atty., Stanley M. Weinberg, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Jeffrey M. Miller, Nasuti & Miller, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

In June 1974 a Japanese company cabled its correspondent bank in the United States to pay $193.51 to Pinto Trucking Service, Inc. A garbled cable, however, led the bank to erroneously deposit $193,511.00 into the company's account. Because of events that allegedly transpired between the time of the erroneous deposit and October 2, 1974, Biagio Pinto, Chief Executive Officer of Pinto Trucking Service, was charged in a three count indictment with bank larceny, making false statements to a bank, and wire fraud. 18 U.S.C. §§ 2113(b), 1014, 1343. Following trial to a jury, Pinto was found guilty of all three counts.

After the return of the verdict and the discharge of the jury, the Assistant United States Attorney who had represented the government during the lengthy pretrial proceedings and the trial itself returned to the courtroom to retrieve the cart in which the voluminous documentary evidence had been stored and transported into the jury deliberation room. In the presence of the deputy clerk, the Assistant United States Attorney discovered that, in addition to the evidence admitted at trial, the evidence cart contained a manilla folder and black briefcase which he recognized as never having been introduced into evidence. He promptly took steps to bring this situation to the court's attention.

In order to ascertain if the extraneous material had been observed by the jurors, a hearing was held on December 12, 1979. At that time eleven of the twelve jurors were questioned by the court.[1] The jurors' testimony revealed that several jurors looked into the briefcase. Although several jurors saw some or all of the contents of the folder and briefcase, most of the contents were examined in a cursory fashion at most. One juror, however, read aloud to the entire jury a nineteen page document that has since been marked as Court Exhibit 1.[2] Court Exhibit 1 is a typed document purportedly listing a chronology of events occurring between the time of the transmission of the cable from the Japanese bank and April 29, 1976. In addition to repeating some of the events described in the indictment, Court Exhibit 1 outlines in considerable detail the extended discussions concerning the possible repayment of the erroneously credited funds that occurred after the

---

1. The twelfth juror was unable to attend the hearing, and all parties stipulated that his testimony would not be required.

The questions posed to the jury were carefully limited so as not to overstep the bounds of Federal Rule of Evidence 606(b), which provides in part that

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or

indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

2. Because of our conclusion as to the result required by the jury's examination of Court Exhibit 1, we need not discuss any of the other extraneous items that were contained in the folder and briefcase.

**580**

time period covered by the indictment but before the return of the indictment.[3] In short, the document that was read to the jury by one of its members suggested that Pinto and persons acting on his behalf had been engaged in discussions concerning repayment of the disputed monies and that at least as late as April 1976 the matter had not been resolved. The bulk of the material in the document was never presented to the jury by testimony or documentary evidence. On the basis of the extraneous information that was before the jury, defendant has moved for a new trial.

The irony that surrounds this motion arises from the fact that prior to trial the government submitted a motion *in limine* to exclude all evidence relating to discussions concerning repayment and eventual repayment. Although the government's motion was vigorously opposed by defendant, the evidence was excluded for reasons not relevant to the instant motion. The government now contends that Court Exhibit 1 is not prejudicial to defendant since defendant himself strenuously sought to introduce evidence along this line. That argument, standing alone, provides little support for the government's position. Although the defendant clearly desired to pursue the issue of eventual repayment at trial, it does not follow that Court Exhibit 1 could create no prejudice. If we had permitted inquiry into this area at trial, defendant would have been entitled to offer witnesses who could testify to it, cross-examine government witnesses, and weave his arguments concerning this topic into his counsel's statements to the jury. None of that, of course, occurred in this case.

■ In *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Court considered a case in which an unnamed person allegedly approached a juror during the course of the trial. The Court stated,

In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Id.* at 229, 74 S.Ct. at 451. Similarly, consideration by the jury of extra-record "facts" about a case is "prima facie incompatible with the Sixth Amendment." *Government of Virgin Islands v. Gereau*, 523 F.2d 140, 150 (3d Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976).

■ A new trial would not be required, however, if the extraneous influence upon the jury did not create a "reasonable possibility of prejudice." *United States v. Stoehr*, 196 F.2d 276, 283 (3d Cir.), *cert. denied*, 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643 (1952). In order to assess the possibility of prejudice to defendant, it is necessary to examine some of the essential elements of the crimes with which defendant was charged. To obtain a conviction for bank larceny, the government was required to prove beyond a reasonable doubt that Pinto took and carried away the disputed funds without right to do so and with specific intent to steal or purloin. Count two required proof that the defendant knowingly

---

**3.** Court Exhibit 1 includes, *inter alia*, the following entries:

10/22/74—[Pinto's lawyer] admitted liability; confirmed present efforts to borrow funds to make repayment.

2/25/75—[Pinto's lawyer] changed his mind about allowing full examination of Pinto records, but reiterated his desire to negotiate a settlement on a commercial basis.

3/6/75—[Pinto's lawyer] offered $10,000 down and $8,000 per month as a commercial settlement.

4/14/76—Vrooman wrote to Pinto noting the failure of response concerning commencement of installment payments, and requesing (sic) Pinto's attention.

made a false statement to influence the action of a federally insured bank. In my charge I instructed the jury that "[a] statement is 'false' if it is untrue when made, and then known to be untrue by the person making it or causing it to be made." Finally, conviction on count three required the jury to find that defendant caused a telegram to be sent willfully and with the specific intent to carry out some essential step in the execution of a scheme or artifice to defraud. It is clear, therefore, that the defendant's knowledge and intent were important considerations for the jury in its deliberations as to each count. Because the defendant was precluded from presenting evidence concerning his attempts to repay the money after the period covered by the indictment, defendant attempted to raise a doubt as to whether the Japanese company in fact owed the disputed money to the defendant. Although proof of the absence of a debt between the Japanese company and Pinto Trucking Service, Inc. was not an element of any of the offenses charged, the existence of such a debt was not totally irrelevant to the issues at trial. First of all, the existence of this debt might have affected the jury's determination of the credibility of several Japanese witness, all of whom denied knowledge of the existence of a debt of such a magnitude. Furthermore, if the jury believed that such a debt existed, they might have concluded that the defendant's actions could be explained by his confusion as opposed to a specific intent to steal or purloin. Similarly, a determination of the defendant's knowledge as to the falsity of statements that he may have made or caused to be made could be affected by identical considerations. For example, in its case the government introduced numerous invoices allegedly generated by Pinto Trucking Service, Inc. solely to convince the bank that it was in fact owed the disputed funds by the Japanese concern. Pinto's references to these documents were relied upon by the government in its argument that Pinto knowingly made false statements to the bank. If the jury believed that such a debt did in fact exist, it might have found that Pinto's statements to the bank were not false or that, at a minimum, he lacked knowledge of their falsity. Therefore, to the extent that Court Exhibit 1 bears upon the issue of the existence of a debt of this magnitude, a reasonable possibility of prejudice to defendant appears.

The government argues that "[n]o entry on Court Exhibit 1 states directly, or indirectly, that the defendant, his company, or his advisors, ever conceded that Nissin did not owe $193,511 to Pinto Trucking Service, Inc." Government proposed conclusion of law number 9. We believe, however, that it is reasonably possible that a juror could infer after examining that document that no such debt existed. The entries on the document state, *inter alia*, that Pinto's lawyer admitted liability, that his lawyer "changed his mind about allowing full examination of Pinto records," that a settlement agreement was reached, and that there was a "failure of response concerning commencement of installment payments." One of the last entries notes without explanation that the bank "wrote off the remaining $100,000." From this document a juror could infer not only that Pinto never asserted the existence of a debt during these negotiations, but that he proved to be unforthcoming not only with his own records but with eventual payments once they had supposedly been agreed upon. Although much of this information, even if true, was irrelevant to the real issues at trial, a significant danger exists that the jury formed an image of the defendant from this document which may have impermissibly influenced its verdict. Moreover, even if this information were relevant, defendant never had an opportunity to cross-examine any witness concerning it or to attempt to explain it in any way. In view of the Sixth Amendment's guarantee of " 'an impartial jury,' the right to confront witnesses, and the assistance of counsel at every critical stage of the trial," *Government of Virgin Islands v. Gereau, supra,* 523 F.2d at 150, and the reasonable possibility of prejudice that exists on the facts of this case, a new trial is required.

We do not believe that the possible prejudice to defendant caused by Court Exhibit 1 is cured by the instruction to the jury that repayment was not an issue for their consideration. The charge, of course, was drafted to conform to the evidence that had been presented to the jury. It did not contemplate the possibility that a hearsay document such as Court Exhibit 1 would inadvertently come to the jury's attention. Furthermore, since the existence of the extraneous material did not come to my attention until after the jury had concluded its deliberations, there was no opportunity in this case to attempt to remedy the situation by a cautionary instruction.

█ In addition to violating defendant's sixth amendment rights, we believe that permitting the jury's verdict of guilty to stand in spite of the intrusion of Court Exhibit 1 into the jury's deliberations would seriously undermine public confidence in our system of criminal justice. "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 473, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965) (footnote omitted). That precept is widely shared, we believe, not only by those in the legal community, but by all those who place their trust in our legal system. On the facts of this case, we believe that denial of defendant's motion would place the "fundamental integrity" of that system in question. Federal Rule of Evidence 606(b)[4] and strong policy considerations dictate that we shall never know

the actual effect, if any, that Court Exhibit 1 had on the jury's deliberations;[5] however, the reasonable possibility of prejudice that appears requires that we grant defendant's motion for a new trial.[6]

was consumed by its examination of Court Exhibit 1. Furthermore, we find the strength of the government's case is outweighed by the possible prejudice arising from Court Exhibit 1.

---

4. See note 1 *supra.*

5. The government argues that the short time required for the jury's deliberations and the strength of the government's case against defendant militate against granting defendant's motion. Although the time required for the deliberations was brief, and although we agree that the government's case was strong, we nonetheless believe that defendant's motion must be granted. First of all, the brevity of the deliberations is dubious support for the government's position: a significant amount of the time during which the jury deliberated (three hours, at most, during which lunch was served)

6. This memorandum constitutes our findings of fact and conclusions of law. For purposes of this motion, we have found it unnecessary to make any findings as to how the extraneous material made its way into the jury room. For purposes of clarity, however, it is worth noting that there has been no suggestion that the intrusion was the result of any wrongdoing on the part of defendant.